## SUE HOPPES v. STATE.

No. A-9686.   Sept. 4, 1940.
(105 P. 2d 433.)

W. V. Stanfield and W. B. Grigsby, both of Ada, and Wayne Wheeling, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Carloss Wadlington, Co. Atty., and J. W. Dean, Asst. Co. Atty., both of Ada, for the State.

DOYLE, P. J. Plaintiff in error, Sue Hoppes, was convicted of the offense of unlawfully transporting intoxicating liquor, and in accordance with the verdict of the jury was sentenced to confinement in the county jail for 30 days and to pay a fine of $50.

The information in substance charged that Sue Hoppes, in Pontotoc county, on the 19th day of January, 1939, did unlawfully transport 53 pints of whisky from a point unknown to the intersection of Fifth street and Ash avenue in the city of Ada. To reverse the judgment she appeals.

The first assignment of error relied upon for a reversal of the judgment is that the court erred in overruling the motion of defendant to suppress the evidence offered on the part of the state.

Before the commencement of the trial, counsel made a motion to suppress all of the evidence which the state seeks to use on the ground that it had been illegally obtained by an unlawful search without a search warrant, and that no offense known to the law had been committed in the presence of the officers before they arrested the defendant.

It was also stipulated that this motion be considered as filed in the civil forfeiture case, State of Oklahoma v. One Chevrolet Automobile, and the evidence introduced in support of this motion will be applicable in the forfeiture case.

In support of the motion to suppress, Sue Hoppes as a witness in her own behalf testified that she lives at 331 West Fourteenth street, and had lived in Ada for the past 20 years; that on January 19th, she was arrested in the 600 block on West Fifth, that she was driving her automobile on the streets of Ada, had observed a car following her a short way back, and as she approached Fifth street the siren sounded, and knowing that officers' cars are equipped with sirens she thought when they blew the siren that meant she was under arrest and she pulled to the curbing and stopped her car. The car following her stopped in front of her car. Joe Porter came back and opened the door of her car, raised up a piece of canvas between the seats and uncovered a quantity of whisky on the floor of her car, and said: "I will drive this car", and told her to get in the back seat. That the bottles were all wrapped in heavy brown paper. He hollered to Jim Rogers who was standing by their car and said, "Jim, drive my car down to the office", and she rode in the back seat of her car to the courthouse, and was kept in custody until she posted bond for the crime of unlawfully transporting intoxicating liquor. Ruby Jean Simmons was with her in her car. They took Ruby home and took her car to the Chevrolet garage; that no search warrant or warrant of arrest was served upon her.

On cross-examination she stated:

"I had been to the grocery store and drove up to my place of business, my Victrola was playing and I drove on because I had intended to get some Victrola needles and forgot them, I said, 'Ruby Jean, I forgot to get those needles.' We went north on 6th street to Daggs' house, turned east on 6th street to go to Paul Carter's in the 600 block West 4th street to get some needles for my Victrola. The first time I noticed the officers' car was when they blew the siren."

Asked, "Did you tell Joe Porter you had a load of liquor, or something to that effect? A. No, sir, I did not."

Ruby Jean Simmons testified that she lives at 105 South Oak, and was with Sue Hoppes when an officer stopped her at Fifth and Oak; that she got in the car at Butler and Hisle's Grocery, on Tenth street, and they drove to Sue's place, then drove on to get some Victrola needles. When they heard the siren Sue stopped the car. The officer's car stopped and Officer Porter came back to the car, asked Sue why she was driving so fast, and opened the door, searched the car and found groceries and whisky; that she did not know the whisky was in the car; that it was after dark; the headlights were turned on.

Cross-examination:

"Q. You say the deputy sheriff opened the door on the car? A. I did. Q. Before he did that, did he ask Sue what her hurry was? A. He asked her why she was driving so fast. Q. Before he opened the door? A. I believe it was. Q. What did she say to him when he asked her that? A. She said she did not realize she was driving fast. Q. She didn't say 'I have got a load of liquor?' A. She didn't, I did not hear her say that."

Asked: "Did Sue leave anything at her place?", answered, "No". Asked, "Why did she go on?" Answered: "She said, 'Ruby Jean, we have to go and get those Victrola needles'," the Victrola was playing and she started back north, going to Paul Carter's on Fourth street, where she always gets needles.

She further stated that Sue did not tell the officer, "I have got a load of liquor."

Joe Porter, deputy sheriff, testified on the motion to suppress that he was with Jim Rogers at the Wilfong Service Station on West Main street, Ada, when he observed the defendant driving a Chevrolet automobile, com-

ing from the south, and she turned west on State Highway 19, towards her place of business, and they immediately started in pursuit; that she drove on by her place, going north. They followed her, driving as fast as he could get his car to run; that when 300 or 400 yards behind he turned his siren on. She stopped her car and he pulled up beside her; that he got out of his car, walked back to her car and asked what her hurry was; she said she had a load of liquor and was trying to get away, to outrun me; that he did not remember the exact words, and did not remember whether she or he opened the door of the car; that he saw whisky in the car, but did not know whether it was before or after the door was opened; that he did not search the car, but just got in and drove it to the sheriff's office; that he had no warrant for the defendant's arrest, nor a search warrant for her car or person.

On cross-examination he testified:

"Q. Joe, why did you follow the defendant when you saw her pass Wilfong's filling station? A. I wanted to see where she went and what she did. Q. What was the purpose of that? A. Whisky. Q. You were suspicious she had a load of whisky? A. Yes. Q. That was the reason you followed her? A. That is true. Q. You had not seen any at that time? A. No, sir. Q. Did you see any whisky from the time she left her house until you stopped her car? A. No, sir. Q. There was nothing that had come within your knowledge that told you she had whisky except on suspicion? A. That is all. Q. When you got out of your car had you seen any whisky at that time? A. No, sir. Q. You continued back to her car? A. That is true. Q. Why did you go back there Joe? A. I went back to see what was in the car. Q. Did you search the car? A. That is right. Q. You do not remember whether she opened the door or you opened it? A. No, sir. Q. Was there another woman in the front seat with her? A. Yes, sir."

Jim Rogers, deputy sheriff, testified that he saw the defendant coming from the south on Bluff avenue, driving a Chevrolet, a girl was with her, and with Joe Porter followed her to her place, and went on after her, and stopped her at Fifth and Ash. Joe was driving, and when he turned the siren on she stopped her car and they drove up beside her. Joe Porter asked her what the hurry was and she said she had a load of liquor and was trying to get away with it; that the girl opened the door on the side he was on and he looked and could see liquor on the floor of the car.

On cross-examination he testified:

"Q. Why did you start in pursuit of the defendant? A. To see where she was going, thought she might have liquor. Q. You thought she had it at that time? A. Yes, sir, had a good idea. Q. You didn't see any when she came by and you started pursuit? A. No, sir. Q. When she left her place of business you didn't see any? A. No, sir. Q. She turned north on Ash? A. Yes, sir. Q. You did too? A. Right behind her. Q. Between 6th and 5th streets Joe turned on the siren? A. No, he turned the siren on before we turned, when we got close enough we thought she could hear it. Q. Joe pulled around the side and up in front? A. He did not pull up in front, he pulled up beside her. Q. Then when you drove up, you stopped your car and got out of the car? A. Yes, sir. Q. You had not seen any liquor from the time you first saw her until the time you went back to her car? A. No, sir. Q. Did you see any liquor before she stopped that car? A. No, not before. Q. Did you have a search warrant for that car Jim? A. No, sir, I didn't. Q. Did you have a warrant for her arrest? A. No, sir, I didn't. Q. Did Joe to your knowledge? A. No, sir, not that I know of. Q. How did you know it was liquor at that time? A. I said I judged it to be liquor. Q. You could not tell by looking at it at that time it was liquor? A. I later found out it was liquor."

At the close of the evidence the defendant moved the court to suppress the evidence for the reason that the

search and seizure was made in violation of her constitutional and statutory rights, in that the search was made without a search warrant and without a warrant for the arrest of the defendant.

"By the Court: Motion to suppress evidence of the state overruled. Exception allowed."

During the trial the question was saved for review by timely objections and exceptions. When the state rested the defendant moved to strike all the evidence obtained by reason of the search, on the same grounds. Motion overruled. Exception allowed. And again, at the close of all the evidence, the defendant renewed her motion and moved for a directed verdict on the same grounds. This was also overruled. Exception allowed.

It has been repeatedly held by this court that, where the offense is not a felony, an officer cannot arrest without a warrant unless the offense was committed or attempted in his presence, and that where the officer does not know of the act constituting the offense it is not committed in his presence. Morris v. State, 66 Okla. Cr. 384, 92 P. 2d 609; Leary v. State, 61 Okla. Cr. 298, 67 P. 2d 972; Wallace v. State, 49 Okla. Cr. 281, 294 P. 198; Coffey v. State, 38 Okla. Cr. 91, 258 P. 923; Whitford v. State, 35 Okla. Cr. 22, 247 P. 424; Graham v. State, 31 Okla. Cr. 125, 237 P. 462. Crossman v. State, 28 Okla. Cr. 198, 230 P. 291.

In Bowen v. State, 50 Okla. Cr. 36, 295 P. 623, this court held:

"A search of an automobile without a search warrant and not as an incident of a legal arrest, not upon any probable cause of the commission of a felony, but upon a mere suspicion, is in violation of article 2, § 30, State Const., Okla. St. Ann., and evidence obtained by such a search is inadmissible."

In the case of Lamb v. State, 59 Okla. Cr. 360, 60 P. 2d 219, this court held:

"The search of the car without a warrant of arrest or search warrant, or knowledge by the officer that it contained whisky, held illegal, and evidence should be excluded upon timely objection."

In Thomas v. State, 32 Okla. Cr. 57, 240 P. 133, it is said:

"In a prosecution for transporting intoxicating liquor, evidence, obtained by search of defendant's automobile without a search warrant, held inadmissible, in view of Const. art. 2, § 30."

In Hamner v. State, 44 Okla. Cr. 209, 280 P. 475, this court held:

"Where a conviction is based solely upon evidence obtained by an unreasonable search and seizure, admitted over timely objections and exceptions, the judgment will be reversed."

In the opinion it is said:

"The defendant had a right to be on the highway, and had a right to drive his car in any direction he desired, and he was not required to stop his car at the command of any individual along the roadside. When the officer tried to stop the defendant's car and began firing at it and started in pursuit, they began an effort to search, and continued it up until the time they claim they overtook the defendant where they claim he was breaking some jars."

In Taylor v. State, 36 Okla. Cr. 431, 255 P. 157, this court said:

"At the time charged in the information certain officers intercepted the defendants in an automobile upon the public highway and attempted to stop them. When they did not promptly stop, they fired into the car in which they were driving and then arrested defendants and searched the car and found in it a jug of whisky. They had no warrant for the arrest of defendants nor any search

warrant, and the apprehension and search was based on suspicion only. This was in violation of the constitutional and statutory rights of defendants and was seasonably objected to. The conviction cannot be sustained."

'And see Keith v. State, 30 Okla. Cr. 168, 235 P. 631; Levy v. State, 31 Okla. Cr. 199, 238' P. 235; Wells v. State, 37 Okla. Cr. 305, 258 P. 285; Welch v. State, 41 Okla. Cr. 207, 271 P. 172; Strong v. State, 42 Okla. Cr. 114, 274 P. 890; Seiver v. State, 59 Okla. Cr. 368, 60 P. 2d 403; Morris v. State, 66 Okla. Cr. 384, 92 P. 2d 603.

In the case of Carroll v. United States, 267 U. S. 132, 45 S. Ct. 280, 288, 69 L. Ed. 543, 39 A. L. R. 790, it was held that:

"The facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that intoxicating liquor was being transported in the automobile which they stopped and searched."

Mr. Chief Justice Taft, delivering the opinion of the court, used the following language:

"It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor, and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travelers may be so stopped in crossing an international boundary because of national self-protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in. But those lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official, authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise."

A "search", within constitutional immunity from unreasonable search and seizure, implies a quest by an officer of the law acting on the things themselves, which quest may be secret, intrusive, or accomplished by force. Bush v. State, 64 Okla. Cr. 161, 77 P. 2d 1184.

In the case of Klein v. State, 26 Okla. Cr. 173, 223 P. 201, 202, we said:

"This court has held that, where the possession of an unlawful thing is open and obvious, so that any one within reasonable distance can readily see it, no search warrant is necessary, and the evidence thus obtained may be received upon the trial of the accused. However, a search implies invasion and quest, and that implies some sort of force, actual or constructive, much or little. The right of the citizen to be secure in his person and possessions from such unlawful search and seizure is as secure as the Bill of Rights can make it (Const. art. 2, § 30), and this right should be respected by officers and courts."

Whether a search is reasonable or not is a question to be determined by the court in each case, taking into consideration the circumstances under which the search was made, and the presence or absence of probable cause therefor.

Counsel for the state in their brief argue that it makes no difference whether an attempt to search began or a search began before the defendant's car was stopped, because when the officers went to the side of the car before any actual search, or before any arrest was made, the defendant told deputy sheriff, Porter, she had a load of liquor and was trying to get away with it; there had been no arrest up to that time. And if the officers had acted illegally in pursuing her, then the illegal acts of the officers may be separated from their legal acts, and they had the right, after being informed by the defendant that

the offense was being committed by the defendant, to look into the car and see the whisky, and arrest the defendant.

It is also urged that the statement of the defendant was equivalent to the officers seeing the offense committed in their presence; therefore, it makes no difference whether under the theory of the law the search had been begun before the officers stopped the defendant's car.

With this contention we cannot agree. In our opinion it is immaterial whether or not any verbal admission was made by the defendant following her arrest, if in fact the defendant was not committing an offense in the presence of the officers before she was arrested. If the arrest was unlawful any verbal admission, if any, made by the defendant following such arrest, was incompetent and inadmissible on a motion to suppress the evidence.

In 6 C. J. S., Arrest, § 5, it is said:

"As a rule two elements must concur to constitute an offense in the presence of the officer: (1) The facts or elements constituting the offense must be revealed in the presence of the officer. (2) The officer must perceive and have knowledge that such offense is being committed. As here used, even though an offense is actually being committed in the officer's immediate vicinity, the offense is not in his 'presence', so as to justify an arrest without a warrant, if he does not know of its commission. Accordingly, where the officer does not know of the commission of an offense in his immediate vicinity until after a search, the offense is not in his 'presence' so as to justify an arrest without a warrant. * * *

"An offense is committed in the presence or view of an officer, within the meaning of the rule authorizing an arrest without a warrant when the officer receives knowledge of the commission of an offense in his presence through any of his senses, or by inferences properly to be drawn from the testimony of the senses, and he is not limited to information derived through the sense of sight.

Accordingly, where through the sense of sight, or smell, or hearing, the officer receives knowledge that an offense is being committed in his presence he may arrest the offender without a warrant. * * *

"An arrest is also justified where the officer, by virtue of a verbal admission made by the offender before his arrest, knows that an offense is being committed in his presence, as, for example, where the offender admits to the officer that he is violating the laws relating to the possession, the manufacture, or the transportation of intoxicating liquor. * * *

"Where an officer, after lawfully stopping or restraining a person, becomes aware that an offense is being committed, or is about to be committed in his presence, he may lawfully arrest the offender without a warrant; but where the officer becomes aware of the facts constituting the offense after making an unlawful arrest, the arrest cannot be justified as being for an offense committed in his presence."

Our Code of Criminal Procedure defines an arrest, and the manner in which it is made, as follows:

"Arrest is the taking of a person into custody, that he may be held to answer for a public offense." Section 2770, 22 Okla. St. Ann. § 186.

"An arrest is made by an actual restraint of the person of the defendant, or by his submission to the custody of the officer." Section 2774, 22 Okla. St. Ann. § 190.

The legality of the arrest must be tested by determining whether the officers were justified in making an arrest without a warrant for a crime not committed in their presence. If they were so justified, the right of search and seizure follows as an incident of the arrest. If the arrest was unlawful, then it is equally certain that the search was unreasonable, and therefore unlawful, and the mere fact in itself that whisky was found in the possession of the defendant would not legalize a search which was unlawful when undertaken.

The testimony of the officers is to the effect that they suspicioned that intoxicating liquor was being transported in the defendant's automobile, and they followed her for the purpose of overtaking, stopping and searching her automobile for intoxicating liquor; that when they sounded the siren on their car, the defendant pulled her car to the side of the street and stopped, and they drove up, stopping alongside and got out of their car to search the defendant's car. Up to and until that time no public offense was committed by the defendant in the presence of the officers.

In 4 Am. Jur., Arrest, § 2, it is said:

"An arrest is the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest. The act relied upon as constituting an arrest must have been performed with the intent to effect an arrest and must have been so understood by the party arrested. Also, the person making the arrest must be acting under some real or pretended legal authority for taking the person into custody. It is not necessary, however, that there be an application of actual force, or manual touching of the body, or physical restraint which may be visible to the eye, or a formal declaration of arrest; it is sufficient if the person arrested understands that he is in the power of the one arresting and submits in consequence. However, in all cases in which there is no manual touching or seizure or any resistance, the intentions of the parties to the transaction are very important; there must have been intent on the part of one of them to arrest the other, and intent on the part of such other to submit, under the belief and impression that submission was necessary."

The term "search", as used in the Constitution, has been defined as follows:

"A search implies invasion and quest, and that implies some sort of force, actual or constructive, much or

little." Combest v. State, 32 Okla. Cr. 47, 239 P. 936, 937.

Upon the record in this case it would serve no useful purpose to differentiate the cases cited in the brief of counsel for the state. Whether search of, or seizure from, an automobile upon a highway or other public place, without a warrant is unreasonable, in the language of the Constitution, is to be determined as a judicial question in view of all the circumstances under which it is made, as this court held in Matthews v. State, 67 Okla. Cr. 203, 93 P. 2d 549.

When the officers started in pursuit, they began an effort to search, and tested by the above statutory provisions when the officers sounded the siren, and the defendant stopped her car and submitted to the custody of the officers, the arrest was then and there consummated. The search that followed was an incident thereto.

It necessarily follows from the foregoing review that upon the admitted and undisputed facts, the arrest of the defendant was unlawful, the search was therefore unreasonable.

For the reasons stated the trial court erred in overruling the defendant's motion to suppress the evidence, and on the trial all the state's evidence was improperly admitted in violation of the defendant's constitutional and statutory rights.

The judgment of the county court of Pontotoc county must be and accordingly is reversed, and the case remanded, with direction to dismiss.

JONES, J., concurs.  BAREFOOT, J., dissents.